**Ambrose ABOUD, M.D. and Columbia/HCA Healthcare Corporation, Appellants,**

**v.**

**A. Lee SCHLICHTEMEIER, M.D., Appellee.**

**No. 13-97-4412-CV.**

Court of Appeals of Texas, Corpus Christi.

Nov. 18, 1999.

Jeffrey Blake Thompson, Alto, NM, Harry M. Reasoner, Marie R. Yeates, Kathleen Bone Spangler, Stephanie K. Crain, Vinson & Elkins, Houston, Lawrence J. Fossi, Houston, David Carroll Mattka, Dennis L. Roossien, Jr., Munsch, Hardt, Kopf, Harr & Dinan, Dallas, for Appellants.

Rowe Jack Ayres, Dallas, Thomas A. Albright, Scott, Douglass & Luton, Austin, Doug Sigel, Cynthia Saiter Connolly, Scott, Douglass & McConnico, Austin, for Appellee.

Before Justices DORSEY, HINOJOSA, and KENNEDY.[1]

## OPINION ON MOTION FOR REHEARING

Opinion by Justice KENNEDY.

We withdraw the opinion previously entered and substitute this opinion in its place.

The parties to this appeal are Ambrose Aboud (Aboud), a medical doctor, and Columbia/HCA Healthcare Corporation (Columbia or EPHS) who were sued by appellee, Lee Schlichtemeier, also a medical doctor. The case arose out of an attempt by the parties to form an association for the purpose of conducting a cancer treatment center in El Paso. The negotiations between the two doctors and a third doctor (who later withdrew) began in 1988 and, in 1989, resulted in the formation of a partnership called Oregon Rim Partners (ORP or the partnership). Appellant Columbia owned hospitals in El Paso which it operated under the name of "El Paso Healthcare Systems" (EPHS). EPHS became involved in the negotiations. Detailed negotiations were had between the parties hereto and other entities in an effort to achieve the desired result, however, by 1992 the negotiations fell through and ORP made a settlement with EPHS.

Schlichtemeier alleges that the settlement resulted in a loss to the partnership and that the settlement was procured by fraud and breach of fiduciary duty by Aboud. Specifically, he alleges that he discovered the existence of letters and other communications which passed between Aboud and EPHS while negotiations were going on between the partnership and EPHS. Schlichtemeier discovered these communications as the result of evidence which came out in another, unrelated lawsuit.

He further alleges, 2) participation in the breach of duty by Columbia, 3) fraud, fraudulent non-disclosure, misrepresentation and deceit by Aboud, 4) tortious interference with contractual interests (ORP) by Columbia, and 5) a conspiracy by Aboud and Columbia to commit the foregoing acts. He sought actual and exemplary damages.

Columbia answered by general denial, special denials challenging Schlichtemeier's capacity to sue and further challenging the existence of a partnership between Schlichtemeier and Aboud at the time of the conduct about which Schlichtemeier complains. The answer also alleges eleven affirmative defenses.

Columbia also filed a cross-claim against Aboud alleging that, in the event plaintiff prevails, the communications plaintiff complains of were had with Aboud based upon Aboud's representations that Aboud's relationship with Schlichtemeier had terminated.

Prior to the aforesaid cross-claim, Aboud had filed a cross-claim against Columbia alleging that a representative of Columbia had told him that the benefits promised Aboud in his private negotiations with Columbia had been simultaneously offered to Schlichtemeier. Aboud further alleged that he first learned that this was not so when discovery was underway in the present suit.

1. Retired Justice Noah Kennedy assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to Tex. Gov't Code Ann. § 74.003 (Vernon 1988).

The crux of the primary suit, Schlichtemeier's suit against Columbia and Aboud, is the allegation that he (Schlichtemeier) was still a partner with Aboud in negotiations with Columbia to make some sort of arrangement for a cancer treatment center to include all three parties and that Aboud, by inducement from Columbia, entered into a secret deal with Columbia which eliminated Schlichtemeier. Schlichtemeier first learned of the secret deal after he and Aboud had terminated their partnership.

In the trial before the jury, the trial judge severed the cross-actions of Aboud and Columbia and proceeded upon Schlichtemeier's claims against Aboud and Columbia. He also bifurcated these causes into two phases. Phase one was tried on all issues except the amount of punitive damages, which issue was tried in phase two. The jury's answer on both phases resulted in a judgment for actual damages against Aboud and Columbia, jointly and severally, in the amount of $1,430,000, plus prejudgment interest. Punitive damages were awarded in the amount of $50,000 against Aboud and $5,000,000 against Columbia, together with post-judgment interest.

Both Columbia and Aboud have filed appellant's briefs, however, Aboud's brief contains an explanatory note in which he states "... Aboud asks the court to take note that this brief is, in significant part, identical to the opening brief filed by Columbia." We also note that Aboud's four "issues presented" are the same as, or are incorporated into, Columbia's first three issues and part (a) of Columbia's issue number six. By addressing all of Columbia's issues we will address all issues presented in this appeal.

Columbia's issue number one alleges no evidence and insufficient evidence that Aboud and/or Columbia's conduct caused Schlichtemeier to lose the opportunity to own and practice in the cancer treatment center. The jury found that Aboud breached a fiduciary duty that caused damage to Schlichtemeier.[2] It also found that Columbia knowingly participated in the breach of fiduciary duty by Aboud.

We review a no evidence point of error by viewing the evidence in a light tending to support the finding of a disputed fact and we disregard all inferences to the contrary. *Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex.1992). If there is any evidence of probative force supporting the finding, we overrule the point of error and uphold the jury's findings. *Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex.1996).

When we review a factual insufficiency of the evidence claim we will consider and weigh all of the evidence, not just the evidence which supports the verdict. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998). If we determine that the evidence supports the jury's verdict we are not required to detail all the evidence supporting the judgment when we affirm the trial court's judgment (except as hereinafter recited as punitive damages). *Id* at 407. On the other hand, when reversing a trial court's judgment for factual insufficiency we must detail all the evidence relevant to the issue and clearly state why the jury's finding is factually insufficient or so against the great weight and preponderance of the evidence that it is manifestly unjust. *Id* at 407.

In answer to the question in his deposition, "with hind sight, sir, do you think that you treated Lee Schlichtemeier unfairly?" Aboud answered "yes." Further, he was asked, "did anyone from Columbia counsel you either to discuss that issue with Dr. Schlichtemeier or to not discuss that issue [an arrangement with Columbia independent of the partnership]?" His answer was:

2. In connection with this issue, the jury was charged by the court that, "a venturer has no duty to offer to his former venturers a business opportunity which arises after the partnership or joint venture has been terminated."

A. I was instructed not to.

Q. By whom?

A. Richard Scott, Lonnie Busby and Russ Schneider.[3]

In addition to the foregoing, the jury heard testimony about a conversation between Russ Schneider of Columbia and Aboud, which Schneider asked Aboud to "keep on the Q.T."[4] This phone conversation was taped by Aboud, unknown to Schneider at the time, and the tape was played for the jury during the trial. Aboud admitted that Schlichtemeier was kept in the dark about a proposal made by Schneider in the conversation to benefit Aboud only.

The jury also heard evidence that on July 5, 1991 Aboud wrote a letter to Mr. Rick Scott at Columbia asking for a binding proposal from Columbia at which time he would dissolve his partnership with Schlichtemeier. When Aboud received the requested letter from Scott, he did not give a copy to Schlichtemeier because of instructions he had received from Columbia's representatives.

Schlichtemeier testified that the first he knew of Aboud's deal with Columbia was when Frank Ainsa, an attorney, told him about it in 1995. Ainsa learned of the deal while he was a witness in a lawsuit between a company named Piping Rock and EPHS. On that occasion, Ainsa was shown "certain letters that involved Dr. Aboud and Columbia which he had not been aware of and he presumed that I [Schlichtemeier] had not been aware of." When Schlichtemeier heard of this he became "rather angry," and within a very short period of time "I contacted legal counsel about the matter."

Appellants Columbia and Aboud, argue that there is no proof, or insufficient proof that this conduct caused Schlichtemeier to lose the opportunity to own and practice in the cancer treatment center. We disagree.

On July 5, 1991, when Aboud wrote the letter to Rick Scott, previously referred to, in which he requested "a binding proposal from Columbia," he referred, in his opening statement, to the "proposed cancer center in which I am involved." When Aboud was asked about the letter, in his deposition, the following occurred:

Q. Now, is that the cancer treatment center that you and Dr. Schlichtemeier, as partners in ORP, were attempting to develop and have built?

A. Yes.

Q. And a cancer treatment center indeed eventually was constructed?

A. Yes.

On cross-examination of Aboud at trial he confirmed his lawyer's statement (in a letter dated in February of 1995) that "one of two things was going to happen, either you and Dr. Schlichtemeier were going to do your own center, or you were going to be involved in the cancer treatment center actually constructed by El Paso Healthcare Center." Then the following occurred:

Q. Is it true that in February of 1995, that but for the conduct of Columbia you and Dr. Schlichtemeier would either have done your own center or you would have been involved in the center by El Paso Healthcare System?

A. That is correct.

It is impossible to say with certainty what would have happened in any scenario where a wrongdoing interrupts the course of events. We hold that the jury could reasonably have believed that, but for Aboud's secret agreement with Columbia, and considering the relationship and goals the two doctors shared, some sort of cancer treatment center, beneficial to both

3. All of whom represent Columbia.

4. The term used was "Q.C.", which in hospital terminology stands for "quality control," however, Schneider, in his deposition, admitted he meant Q.T.

doctors, would have been a reality. We overrule appellants' first issue.

Appellants' second and third issues will be considered together. They are:

2. Were the lost profit damages that Schlichtemeier claimed in this case susceptible of proof by reasonably certain evidence, and did Schlichtemeier present reasonably certain evidence of those lost profit damages?
3. Was the jury free to leap entirely outside the record and find that Aboud's conduct caused 1.43 million in actual damages?

When there are firmer reasons to expect a business to yield a profit, the business is not prohibited from recovering merely because it is new. *Texas Instruments v. Teletron Energy Mgt.*, 877 S.W.2d 276, 280 (Tex.1994).[5] The focus is on the experience of the persons involved in the enterprise and the nature of the business activity, and the relative market. *Id* at 280.

As stated earlier, Aboud admitted that, but for the conduct of Columbia, he and Schlichtemeier would have joined in some form of enterprise. The evidence shows that Aboud had a large and successful practice in El Paso. Schlichtemeier had been a radiation oncologist for nearly twenty-five years and he had been successful in developing and operating facilities, similar to the one proposed, in other locations. In the early conversations with each other, Aboud told Schlichtemeier that the present radiation center in El Paso was totally inadequate; that it could not even provide a patient with a urinalysis test if he needed one.

A study conducted for Columbia prior to the lawsuit was very upbeat about the future of free standing radiation oncology centers. The study predicted a net income from the second through the fifth years totaling $1,436,236 with a net loss the first year of $67,331.

Aboud testified that he authorized his lawyer to send a demand letter to Rick Scott and others claiming five million dollars for the damages the conduct of Columbia, Rick Scott, and others caused him to suffer. His testimony continued as follows:

Q. And what is it that you were deprived of that caused you to be harmed or damaged to the extent of 5 million?

A. The inability to own half the cancer center.

Q. Would you agree with me, sir, that Dr. Schlichtemeier also lost the opportunity to own the cancer center?

A. Yes.

Q. Is the 5 million figure, sir, is that for a half interest or a whole interest in the building?

A. A half interest.

Schlichtemeier called as an expert witness James R. Vinson who has a bachelor's degree in banking and finance, two masters' degrees in economics, and a Ph.D. degree, primarily in economics. Vinson testified in detail to the methodology used to prepare him to testify in the case. He was finally asked, and he answered as follows:

Q. Dr. Vinson, what is your opinion as to the present value of the business opportunities that Dr. Schlichtemeier was unable to pursue in this matter based upon a reasonable degree of certainty?

At this point, opposing counsel took the witness on *voir dire* and, following several pages of questions and answers, moved to strike his testimony. The motion was denied and the testimony continued:

Q. Dr. Vinson, what is your opinion as to the amount?

5. *Teletron* was a case where an award for damages for future earnings of a business was reversed as too speculative, however, *Teletron* involved a totally new product being put on the market for the first time.

A. In my opinion, the present value of the lost business opportunities for technical services, business, the professional services opportunity and the radiation therapy building for the years 1993 through the year 2000, and for the sale of the business at the end of that time period discounted back to present value is $30,504,236.

In opposition, Columbia called Donald A. Erickson as an expert witness on damages. Erickson is a partner in the firm of Ernst and Young, a financial and management consulting firm. Mr. Erickson is solely involved in business valuations. He holds an undergraduate degree in business economics from Santa Clara University and an MBA degree in finance from the University of Oregon, and is certified in business evaluation by the American Society of Appraisers.

Mr. Erickson was critical of the Vinson report and stated his reasons why. A summary of his testimony is that the present value of the proposed center is zero.

In *Tenngasco Gas Gathering Co. v. Bates,* 645 S.W.2d 496, 498 (Tex.App.—Corpus Christi, 1982, writ ref'd. n.r.e.), this court said:

> In the case before us it appears that in estimating values the jury did blend the testimony of the two experts to arrive at figures which were between the two opinions. We hold, therefore, that there was some evidence and sufficient evidence to support the jury's answer to the before and after taking special issues.

*Hunt v. Ellisor & Tanner, Inc.,* 739 S.W.2d 933 (Tex.App.—Dallas, 1987, writ denied), was a case where the testimony of two witnesses offered a range of zero to three million dollars. The jury found damages of $41,500. The court said:

> . . . the complex nature of the witness' testimony, both direct and cross-examination, afforded the jury much opportunity to accept and reject what they were hearing. Expert opinion testimony is but evidentiary, and is never binding upon the trier of fact. Thus, the fact finder is not cut off from exercising considerable personal judgment about how far such opinions are to be relied upon.

*See also City of Houston v. Harris County Outdoor Advertising Assn.,* 879 S.W.2d 322, 334–6 (Tex.App.—Houston [14 th Dist.] 1994, writ denied), *cert. denied,* 516 U.S. 822, 116 S.Ct. 85, 133 L.Ed.2d 42 (1995); *Parallax Corp., N.V. v. City of El Paso,* 910 S.W.2d 86, 92 (Tex.App.—El Paso 1995, writ denied)(the jury finding will survive a factual sufficiency attack if it falls within a narrower "range" of the expert testimony).

To support its third issue, Columbia cites *Callejo v. Brazos Electric Power Co-op.,* 755 S.W.2d 73 (Tex.1988); *First State Bank v. Keilman,* 851 S.W.2d 914 (Tex. App.—Austin 1993, writ denied); and *Shearer's, Inc. v. Lyall,* 717 S.W.2d 128 (Tex.App.—Houston [14 th Dist.] 1986, no writ). We find these cases distinguishable. *Callejo* was a condemnation case where the value placed on the "after" value by the jury was ten times the highest value testified to.

*Keilman,* as pointed out in appellee's brief, is an either/or proposition. The amounts of interest owed was either $7,161.44 unauthorized or $169.92, none of which was unauthorized. Neither side could explain the figure $360.00 found by the jury, and there was no way to justify it. Even in *Keilman,* the court in its opinion reiterates the general rule that the trier of fact has broad discretion in assessing damages where the law provides no precise legal means, and the jury's findings will not be disregarded merely because the jury's reasoning in arriving at its figures may be unclear.

*Shearer's* was a bench trial involving the intrinsic value of five pine trees and five oak trees bulldozed from plaintiff's land. The only value testified to was $72,500. The appellate court agreed with the trial court's reasoning that the $72,500 figure

was unrealistic, however, it found an abuse of discretion in the judge's finding of $2,250 in actual damages. Once again the appellate court reaffirmed the "wide latitude given the jury."

In the case before us the testimony of both experts was lengthy and detailed. Together, they contained many components to be considered and many estimates of values to be assigned to each. It is fundamental that a jury may believe all, some or none of a witness' testimony.

We hold that there is evidence to support the jury's finding in regard to actual damages. We overrule issues two and three.

Appellants' fourth issue is, "did the trial court properly find Columbia liable for $1.43 million in actual damages and $5 million in punitive damages even though the jury did not find, and was not asked to find, that Columbia's conduct caused any actual damages?" We divide the issue into two parts, *i.e.*, that part which challenges the sufficiency of the finding to permit an award for actual damages and that part which would permit an award for punitive damages.

We first respond to appellants' issue insofar as it relates to actual damages. The jury answered in question six that Aboud committed fraud against Schlichtemeier. In question eight the jury awarded the $1.43 million dollars to Schlichtemeier as compensation for damages proximately caused by Aboud's fraud. In question nine the jury answered that Aboud and Columbia engaged in a civil conspiracy to defraud Schlichtemeier. In a portion of question nine the jury was required to find that there were "damages as a proximate result" of the conspiracy. We hold that these answers, taken together, negate any necessity for a separate finding that Columbia's conduct caused any actual damages to Schlichtemeier. Columbia's reliance on this court's holding in *Chachere v. Drake,* 941 S.W.2d 193, 196–7 (Tex.App.—Corpus Christi, 1996, writ denied), is misplaced. In *Chachere,* appellee argued that because appellant failed to offer proof of, or obtain a finding on, actual tort damages, appellant should not be entitled to recover actual or punitive damages on his fraud claim. This court agreed and so held. As stated above, the jury here found fraud by Aboud and that Columbia was a conspirator in the fraud.

We overrule Columbia's fourth issue insofar as actual damages are concerned.

Insofar as punitive damages are concerned, we join issue four to issue five which presents a different problem with respect to punitive damages. Columbia's original brief challenges the definition of "malice" in question number five in the court's charge for not following the statutory definition. Following the jury's answer of "yes" to this question, in the second portion of the bifurcated trial, the issue of punitive (exemplary) damages was submitted in a single broad-form question containing both "malice" *and* "conspiracy" theories of punitive damages.

On July 1 of this year, and since both oral and written submission of this case, the supreme court decided *Crown Life Insurance Co. v. Casteel,* No. 98–0218, 1999 WL 450773 (Tex. July 1, 1999). In *Crown Life* an agent and an insured sued Crown Life.[6] The agent (Casteel) sued under Article 21.21 of the Texas Insurance Code and also under the provisions of the Deceptive Trade Practices Act (DTPA) as a consumer. The court held that Casteel had standing to sue under article 21.21 of the insurance code but not as to claims requiring consumer status under the DTPA. The trial court had submitted the damages issue as a broad-form issue containing alleged acts under both the insurance code and the DTPA and the jury gave one

6. Casteel was the agent who was sued, along with Crown Life, by the insured. Casteel filed a cross-action against Crown Life.

answer to the amount of damages. The supreme court said "we also hold that submitting invalid theories of liability in a single broad-form jury question is harmful error when it cannot be determined whether the jury based its verdict on one or more of the invalid theories." In *Crown Life,* the supreme court was dealing with damages, however, we see no distinction to be made in the problems connected with a broad-form submission of a damage issue and a similar submission of a liability issue.

Schlichtemeier's original position was that "the jury's conspiracy finding independently supports punitive damages." He argues, "because the underlying tort warranted punitive damages, a punitive damage award against a co-conspirator was proper even though there was no separate malice finding against the co-conspirator. (Citation omitted). Applied to the present case, *Akin* [7] supports the award of punitive damages against Columbia based on the conspiracy finding alone."

We hold that, in view of the holding in *Crown Life,* this argument has no merit. The jury was required to find both malice *and* conspiracy in order to award punitive damages according to *Crown Life.* Thus, it is necessary to decide whether the definition given the jury of "malice" in the original charge will support an award of punitive damages.

The definition of "malice" given in question number five is:

> 'Malice' means conduct that is specifically intended by Columbia to cause substantial economic damage to Dr. Schlichtemeier, or an act that is carried out with a flagrant disregard for the rights of Dr. Schlichtemeier and with an actual awareness on the part of Columbia that the act will, in reasonable probability, result in substantial economic damage.

This was the manner in which appellee chose to submit the issue.

The Legislature has given us the proper definition of "malice" which, at the time of the alleged acts of appellants, was:

> (6) 'Malice' means:
>
> (A) Conduct that is specifically intended by the defendant to cause substantial injury to the claimant; or
>
> (B) An act that is carried out by the defendant with a flagrant disregard for the rights of others and with actual awareness on the part of the defendant that the act will, in reasonable probability, result in human death, great bodily harm, or property damage.

Acts 1987, 70 th Leg., 1 st C.S., ch. 2 § 2.12, eff. Sept. 2, 1987. *Amended by* Acts 1995, 74 th Leg., ch. 19 § 1, eff. Sept. 1, 1995.

The definition of malice given the jury in this case is more restrictive than the legislative definition. Obviously, the legislative definition is designed to cover a broad spectrum of situations. The definition in the Charge does not enlarge upon the legislative definition. It is tailored to fit the facts of this case. We hold that it was proper to submit the definition as it appeared in the court's charge. In any event, no harm occurred to Columbia because of the more restrictive submission. And, finally, Columbia and Aboud made no objection to the Court's definition of malice in the court's charge and thereby waived any complaint about its wording.

Having carefully examined the lengthy record in this case, we cannot say that there was no evidence or insufficient evidence of Columbia's conduct sufficiently egregious to support an award of punitive damages. We cite examples of such evidence [8] which, taken from the record of the trial, are (in addition to those previously referred to):

7. *Akin v. Dahl,* 661 S.W.2d 917 (Tex.1983).

8. As required by *Transportation Insurance Co. v. Moriel,* 879 S.W.2d 10, 31 (Tex.1994).

1. On November 16, 1990 Schneider telephoned Aboud, offering to help Aboud. He accused Schlichtemeier of being the "problem with the project." During this conversation he said to Aboud:

   > But, what I'd like to do, if I can have your permission to do this ... you know, you don't have to acknowledge it, if you were subpoenaed you can deny it ... but I'd like to solicit a proposal from a different radiation therapy operator. On the absolute "QC" so I can have a comparative proposal and so I can come to you and say the reason this deal is not as attractive as it was when we started ... is not because of the market or of financing or anything, its because of Frank Ainsa and Lee Schlichtemeier.

2. On January 11, 1991, Schneider and Aboud had another telephone conversation in which Schneider offered to Aboud the possibility of increasing his (Aboud's) interest from 50 percent to 51 percent upon Schlichtemeier's exit.
3. On February 19, 1991 Schneider sent a letter to Aboud in which he stated "if you choose to relinquish your ownership interest with Oregon Rim Partners and become a tenant in the facility, then we would propose that you have the opportunity to participate as a direct owner in up to a 50 percent ownership position in the new facility. Schneider also instructed Aboud to conceal this letter from Schlichtemeier.
4. On July 3, 1991, Busby wrote a confidential letter to Aboud in which he clearly stated his intent to exclude ORP. He stated therein "... our intention to develop this project with your support and the involvement of CDP, but without the participation of Oregon Rim Partners.
5. On July 5, 1991, Aboud wrote Scott, Columbia's chairman and CEO, to get written confirmation of the secret deal from Columbia's highest authority. Scott had instructed Aboud to make the letter "personal and confidential." Aboud was clear in his letter that ORP had not been dissolved.
6. Scott answered this letter on July 15, 1991 which Aboud concealed on instruction from Columbia.
7. Subsequently, Aboud secretly wrote a letter to EPHS, with whom ORP was still negotiating, and said: "I have requested that Mr. Frank Ainsa accept the recent offer made to us by your attorney, Mr. Cavanaugh." Aboud wrote directly to EPHS despite his agreement that all settlement communications were to go through Ainsa.
8. The record shows the following questions to Aboud and his answers:

   A. (Aboud) In hind sight I feel that I should have asked Dr. Schlichtemeier had he got the same offer as I had from Columbia. My problem was implicit trust of Columbia, on their word that they were going to take care of both me and Dr. Schlichtemeier.

   Q. Who at Columbia told you that?

   A. The above-mentioned people that I—

   Q. Mr. Scott?

   A. Mr. Scott, Lonnie Busby and Russ Schneider.

   Q. Why didn't you ask Dr. Schlichtemeier if he was being offered some deal or arrangement independently of the ORP partnership?

   A. It was based on my trust of Columbia. I should have asked Dr. Schlichtemeier. It was an error on my part and a mistake.

   Q. Did anyone from Columbia council urge you either to discuss that issue with Dr. Schlichtemeier or to not discuss that issue?

   A. I was instructed not to.

   Q. By whom?

A. Richard Scott, Lonnie Busby and Russ Schneider.

9. On January 27, 1992 EPHS and ORP entered the settlement agreement. The agreement contained an entireties clause that was false because there was no mention of the side deals with Aboud. The jury found the agreement was procured by fraud.

10. Aboud testified that Columbia did get rid of Schlichtemeier and he blamed Columbia for what happened to Schlichtemeier. The following is an excerpt from Aboud's deposition which was read to the jury:

A. I don't feel responsible for what happened to Dr. Schlichtemeier.

Q. Who is?

A. I believe that whatever transpired between Dr. Schlichtemeier and I occurred because of Columbia.

We overrule issues four and five and deny the relief sought therein.

Issue number six challenges the award of prejudgment interest in the following particulars:

a. Did the trial court properly award *Cavnar* prejudgment interest on unsegregated past and future damages?

b. Did the trial court properly award *Cavnar* prejudgment interest even though Schlichtemeier failed to prove or obtain a jury finding of the date his supposed actual damages accrued?

c. Did the trial court use the proper accrual date in its award of prejudgment interest?

d. Did the trial court properly order prejudgment interest to be compounded daily?

In addressing part a. of this issue we follow the reasoning set forth in *Winograd v. Clear Lake City Water Authority,* 811 S.W.2d 147, 157 (Tex.App.—Houston [1 st Dist.] 1991 writ denied). In that case, as in the case before us, the plaintiff presented his evidence of lost profits (opportunities) in such a manner as to represent their value at the time of the occurrence giving rise to the lawsuit. In this case, there was no independent evidence of future damages, thus there was nothing to segregate. As presented by Schlichtemeier's expert witness all of the damage occurred on the date of the alleged breach.

For the remainder of this issue we observe that the jury was not asked to find a date upon which we can establish when appellee's accrual of prejudgment interest should begin. For this reason, we hold that prejudgment interest began to accrue on the date suit was filed, which was August 30, 1995. The interest should be computed as simple interest. *Johnson v. Kenneco Energy,* 962 S.W.2d 507, 532 (Tex.1998).

We affirm that portion of the trial court's judgment which was awarded $1,430,000 as actual damages against Aboud and Columbia, jointly and severally. We REFORM the award of prejudgment interest in order that it may be calculated as simple interest at the rate of ten percent (10%) from August 30, 1995. We AFFIRM the award of punitive damages against Columbia in the amount of $5 million dollars together with post judgment interest at the rate of ten percent (10%). We AFFIRM the remainder of the trial court's judgment.