Affirmed and Opinion filed February 26, 2009








Affirmed and Opinion filed February 26, 2009.

 

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-07-00853-CV

_______________

 

WATERWAYS ON THE INTERCOASTAL, LTD., A/K/A/ WATERWAYS
ON THE INTRACOASTAL, LTD., Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

                                                                                                                              
                 

On Appeal from County Court No. 3

Galveston County, Texas

Trial Court Cause No. 50964

                                                                                                                                               


 

O P I N I O N

In this condemnation case, the
property owner challenges the legal and factual sufficiency of the evidence
supporting the jury=s determination of value for real estate located in Galveston
County, Texas.  Because the jury=s finding of the condemned property=s fair market value is within the
range of evidence presented at trial, we affirm.

 








I. 
Factual and Procedural Background

In December 1999, appellant Waterways
on the Intercoastal, Ltd. (AWaterways@) purchased the property known as Placement Area 42 (APA 42@), consisting of 242.364 acres on
Bolivar Peninsula, for $645,660; the sale was finalized in January 2000.  From
1954 to 1999, the U.S. Army Corps of Engineers had an easement on the property
and used the area to deposit dredge materials from the Intracoastal Waterway. 
To accommodate this use, the property had a nineteen-foot levee system and a
drainage outfall structure on it.  The State filed a petition for condemnation
on January 23, 2004, stating the Texas Transportation Commission had found the
property was needed as a dredge material disposal site.  The trial court
appointed special commissioners to assess the damages, and they awarded
$727,000 jointly to Waterways, Port Bolivar Marine Services, Inc., and Laguna
Resources, Ltd.[1]  The State
deposited the funds into the trial court=s registry on September 30, 2004,
which became the date of the taking.  Waterways objected to the special
commissioners= award and the case was tried before a jury in March 2007.  When asked to
find the fair market value of PA 42 as of September 30, 2004, the jury returned
a figure of $1.8 million.  The trial court denied Waterways=s motion for new trial and rendered
judgment on the verdict. 








At trial, the jury heard from
Waterways=s expert appraiser Gerald Teel.  Teel testified that he used three
approaches to value the property: a comparable-sales approach, a
replacement-cost approach, and an income approach.[2] 
Finding no comparable sale of a placement area, he ultimately used the
comparable-sales approach only to value the land, and used the replacement-cost
and income approaches to value the property as a whole.  In his final analysis,
Teel gave weighted consideration to the replacement-cost approach.  To use this
method, Teel first valued the vacant land at $3.2 million based on comparable
sales.  He then considered the replacement cost of the levee and outfall system
by subtracting the cost to level the leveeC$171,450Cand adding the cost to construct a
six-foot levee with an outfall structureC $652,650.[3] 
He ultimately valued the property at $3.9 million.[4] 
When considering the highest and best use of the property, Teel explained that
the property was worth $3.2 million as vacant land, which could then be
developed with residential waterfront lots.[5] 
Under his alternate scenario, PA 42 could be used first as a dredge material
disposal site to raise the elevation and later as a single-family residential
tract, increasing the value of the property. 

Four sales formed the basis of Teel=s vacant-land valuation of PA 42:

$          Land Sale No. 1 consists of 71.93 acres of land at an
elevation of about five feet.  It has frontage along State Highway 87, which is
the major roadway along Bolivar Peninsula, and is bounded by streets on two
other sides.  Although it has no water frontage, it is located one or two
blocks from a public beach on the Gulf of Mexico and sold on August 7, 2004 for
a total sales price of $863,160[6] or $12,000
per acre. 








$          Land Sale No. 2 consists of 63.242 acres of land that
sold on August 6, 2004 for $150,000, but part of this property is wetland. 
Teel considered 12 acres to be usable based on conversations with one of the
purchasers and the Galveston County Appraisal District.  As a result, he calculated
the value of the land by subtracting the value of the wetlands from the
purchase price and dividing the difference by the number of usable acres,
arriving at a value of $10,651 per usable acre.   About 860 linear feet of this
property runs along the waterfront on the Intracoastal Waterway, and its
elevation is approximately five feet.  

$          Land Sale No. 3 is less than ten percent of PA 42=s size, and consists of 21.28 acres
of land in a Ahorseshoe-shaped tract@ on the Gulf of Mexico.  The property has some frontage on
State Highway 87, a total of about 200 linear feet of frontage along the beach,
and its elevation is approximately ten feet.  Based on its sale on January 16,
2004, Teel calculated its price to be approximately $31,250 per acre. 

$          Land Sale No. 4, sometimes referred to as ABirdhaven,@ is adjacent to Land Sale No. 2 and
also contains wetland.  It consists of 86 acres of land along the Intracoastal
Waterway and sold for $250,000 on October 29, 2003.  Teel considered 14 or 15
acres to be usable.  He calculated the value of the land by subtracting the
value of the wetlands and dividing the remainder of the purchase price by the
number of usable acres to arrive at $14,687 per acre.  The property has an
elevation of about five feet.  Approximately 880 linear feet of the property is
waterfront, and the opposite end runs along State Highway 87.  








Teel made adjustments to the prices
per square foot for elapsed time, market condition, and condition of sale,
arriving at adjusted prices of $12,000, $10,664.13, $31,802.23, and $15,041.90
for the respective properties.  He testified extensively about the
characteristics of each property when compared to PA 42.  Of these properties,
Teel found Land Sale Nos. 1, 2, and 4 to be inferior to PA 42, and Land Sale
No. 3 to be superior.  He considered Land Sale No. 4 to be the most similar in
physical characteristics and location to PA 42. Based on Teel=s analysis of the four sales, he
valued PA 42 at $15,000 per acre.  He arrived at his vacant-land valuation by
taking the total acreage of PA 42 and subtracting the area he considered to
contain platted roadways, arriving at a net usable acreage of 224.458 acres.[7] 
He then multiplied 224.458 acres by $15,000 per acre to arrive at a total of
$3,366,870.  Next, he subtracted $171,450, representing the cost to level the
levee, and rounded the resulting figure up to $3.2 million. 

In his testimony, Teel emphasized
that PA 42 has approximately 7100 feet of waterfront and an elevation of
approximately thirteen feet.  On cross-examination, however, he agreed that Abeing on the Gulf of Mexico is far
superior to having a whole lot of linear frontage on the Gulf Intracoastal
Waterway.@  He further agreed that smaller tracts have a higher price per acre, and
PA 42 is at least three times larger than any of the land sales he identified
as comparable.  

The State also cross-examined Teel
about his mathematical calculations for two of the comparable sales based on
usable acres.  Although Teel considered all acres usable on Land Sale Nos. 1
and 3, he did not make the same determination for Land Sale Nos. 2 and 4
because the latter properties contain wetlands.  Nevertheless, the State=s attorney asked Teel to calculate
the price per acre of Land Sale Nos. 2 and 4 using total acreage, rather than
usable acres.  Using a calculator, Teel divided the sales price of each
propertyC$150,000 and $250,000Cby the gross acreage of each saleC63.242 and 86Cand arrived at values per acre of
$2,371 and $2,907, respectively.  Finally, the State asked Teel to multiply the
net usable acreage of PA 42 by $2,907, resulting in a figure of $652,000. 
Teel, however, emphasized that this figure represented only the calculations of
the State=s trial counsel and not his own valuation.     








According to Teel, his
cost-replacement and income valuations were based on information he received from
Hollie Stanley, a professional engineer.  Stanley testified that he estimated
the cost of leveling the six-foot high levee at $171,450 and the cost of
constructing a six-foot levee at $652,650.  In his report, Stanley estimated
the cost to build the outfall structure to support the six-foot high levee at
$50,000.[8]  Stanley also
stated that he had seen a document estimating the cost to completely
reconstruct the levee as originally built for $2.8 million to $2.9 million. 
When asked whether there was a need for PA 42 as a dredge site, Stanley stated
he had seen documents indicating there were several private businesses within
about a five-mile radius of PA 42 with dredging needs; on cross-examination, he
named a few of them.  Stanley stated he was unaware of any prohibition to the
operation of PA 42 as a dredge site in September 2004.  Stanley also testified
to the Atipping fee@ he provided for use in Teel=s income approach.[9] 


Waterways called Raul Cantu, a
representative for the Texas Department of Transportation, as an adverse
witness.  According to Cantu, PA 42 is a unique site because the Army Corps of
Engineers already possessed the environmental clearance necessary to use the
property as a disposal area for dredge material and had built the outfall
structure and nineteen-foot levee.  Cantu agreed that there were no other
properties on the Bolivar Peninsula with these characteristics.  

John Dafonte, one of the owners of PA
42, testified that Waterways purchased the property in 1999 and finalized the
sale in January 2000.  According to Dafonte, Waterways was interested in the
property because of its elevation, size, and waterfront.  Dafonte testified








that Waterways planned to use the
property by first selling sand dredge, then operating a dredge placement
facility, and finally converting it into a residential subdivision.  He
identified several businesses and properties in the area, including some of his
own, with dredging needs.  According to Dafonte, none of these plans came to
fruition because the State announced its intent to take the property about a
week after Waterways purchased it.  Dafonte ultimately valued the property at
around $5 million based on the development on Bolivar Peninsula and PA 42=s characteristics.  

Luis Saenz, a project engineer from
the Galveston District Corps of Engineers, testified that leveling the levee on
PA 42 as Teel proposed would level only the areas immediately adjacent to the
levee, but would not level the entire property as required for residential
development.[10]  Saenz
estimated that leveling the entire property would cost from just over $800,000
to just over $1 million.   








Appraiser David Dominy also testified
concerning the property=s value.  The State questioned Dominy about the land sales on
which Teel=s vacant-land valuation was based.  When asked to confirm that Land Sale
No. 4 had a total of 86 acres of which 16.53 were usable, Dominy stated that he
did not recall that 16 acres were usable, but he did recall that 86 gross acres
sold for $250,000, representing a gross basis of $2,907 per acre.  Regarding
Land Sale No. 2, Dominy confirmed that the 63.24-acre lot sold for $150,000. 
The State asked Dominy whether $150,000 divided by 63.24 acres was $2,372 per
acre, to which Dominy responded, AYes, I believe that=s how the math works.@  As to Land Sale No. 3, Dominy
confirmed a purchase price of $800,000 for 21.28 acres, but stated that the
price included the improvements as well as the land.[11] 
Dominy also confirmed that the sales price for Land Sale No. 1 was $863,160 for
71.93 acres, but he testified that he did not use this property in his
valuation of PA 42.  He further testified that he has never made an adjustment
for the uniqueness of a property because, in his opinion, that is already
accounted for when considering a property=s characteristics.     

Dominy also discussed a property
known as Laguna Harbor.[12]  He
confirmed that this 77.1-acre property sold for $300,000 and that dividing the
purchase price by the number of acres results in a price of $3,891 per acre. 
Dominy testified that, if valuing PA 42, he would use this transaction in his
calculation because he considered the sale an arm=s-length transaction, and the
property is the most similar to PA 42.  The record indicates that Dominy did,
in fact, use Laguna Harbor in his calculation of PA 42=s value.[13] 
Teel, on the other hand, did not consider the sale of Laguna Harbor to be an
arm=s-length transaction, and as a
result, he excluded the property from consideration as a comparable sale. 
Nevertheless, he was able to answer some questions about the property because
he had served as the appraiser during its sale.  Teel estimated that Laguna
Harbor=s waterfront is approximately one
thousand feet long, and agreed that he appraised it as a residential
subdivision.  He also agreed that this is the highest and best use for both
Laguna Harbor and PA 42.  Both properties line the Intracoastal Waterway and
are separated only by a marina, and access to the properties is approximately
equal.  Teel further testified that the amount of Awaterfront feet per acre on that
tract is probably closer than anything else that we=ve looked at.@








Dominy explained that the highest and
best use of a property guides him as to the value approach and comparable sales
he uses.  In Dominy=s opinion, the cost approach was not appropriate for valuing
PA 42 because the highest and best use of this property was for primary
residential development; thus, the levee and outfall structure do not add
value.  He noted that it would take Aquite a bit of money@ to prepare PA 42 for development. 
As a result of his conclusion that the highest and best use of PA 42 was
residential, Dominy determined the comparable-sales approach was the
appropriate valuation method, making adjustments for all the differences
between the subject property and the comparable sales. 

Waterways=s trial counsel cross-examined Dominy
regarding one of his appraisal reports on the property.  In the report, Dominy
indicated that most any use of the property was legally permissible; commercial
or residential use was physically possible; and a commercial endeavor would be
financially feasible.  Dominy concluded that the maximally productive use of
the property would be a waterfront development that included residential use as
a component.   He reiterated that the levee on PA 42 did not add value to the
highest and best use of the property and that it is Aactually something that=s going to have to be knocked down in
order to level this property out for ultimate development.@  When asked whether he considered
elevation in his valuation approach, Dominy testified that he felt the benefit
of having a higher elevation was offset by the costs to ready the property for
development.  Although Dominy testified that he had not determined the cost to
ready PA 42 for development, he noted that another property incurred costs of
$35,000 per acre to plant grass and trees.  On cross-examination, Waterways
elicited testimony that in one of his reports, Dominy valued PA 42 at
$2,908,368, but only the page on which Dominy discussed the property=s highest and best use was admitted
into evidence.  Teel=s report, on the other hand, was admitted in its entirety. 
In addition to Teel=s valuation analysis, it contains a variety of mapsCaerial, topographical, flood plain,
land sales, neighborhood, and plat mapsCsurveys,  a metes and bounds
description, detailed information about the comparable sales, and the history,
site analysis, and tax analysis[14] of the
property.








II.  Issues Presented

In two issues, Waterways challenges
the legal and factual sufficiency of the evidence supporting the jury=s finding that the fair market value
of the property on the date of the taking was $1.8 million.

III.  Standard of Review

To determine whether the evidence is
legally sufficient to support the judgment, we review the entire record,
crediting favorable evidence if reasonable jurors could and disregarding
contrary evidence unless reasonable jurors could not.  City of Keller v.
Wilson, 168 S.W.3d 802, 827 (Tex. 2005).  We assume that jurors decided
questions of credibility or conflicting evidence in favor of the verdict if
they reasonably could do so.  Id. at 819, 820.  If the evidence would
enable reasonable and fair-minded people to differ in their conclusions, then
it is legally sufficient to support the verdict.  Id. at 822.  We do not
substitute our judgment for that of the trier of fact if the evidence falls
within this zone of reasonable disagreement.  Id.  When reviewing a jury
finding for factual sufficiency, we consider and weigh all of the evidence in a
neutral light and conclude that the finding is not supported by sufficient
evidence only if the finding is so contrary to the overwhelming weight of the
evidence as to be clearly wrong and unjust.  See Cain v. Bain, 709
S.W.2d 175, 176 (Tex. 1986) (per curiam).

IV.  Analysis

Fair market value is the price that
the property would bring in a transaction between a willing buyer and a willing
seller.  City of Austin v. Cannizzo, 153 Tex. 324, 331, 267 S.W.2d 808,
813 (1954).  Thus, the jury was instructed as follows:

The term Afair
market value@ means the price which the property would bring when
it is offered for sale by one who desires, but is not obligated to sell, and is
bought by one who is under no necessity of buying it, taking into consideration
all of the uses to which it is reasonably adaptable and for which it either is
or in all reasonable probability will become available within the reasonable
future.

 








            Waterways contends that
the value opinionsCDafonte=s $5 million valuation, Teel=s $3.9 million valuation, and Dominy=s testimony that he reported a value
of $2,908,368Ccreated the range for the jury=s consideration, and argues that no
witness testified to a fair market value below $2.9 million.  Because the jury=s finding fell outside this range,
Waterways contends the evidence is legally and factually insufficient to
support the verdict. 

A.        Callejo
v. Brazos Electric Power Cooperative, Inc.

In support of its contention,
Waterways relies on the Texas Supreme Court case of Callejo v. Brazos
Electric Power Cooperative, Inc.  755 S.W.2d 73 (Tex. 1988).  In Callejo,
the court upheld a legal-sufficiency challenge to the evidence supporting the
jury=s finding that the post-taking value
of an easement condemnation was $364,928.80.  Id. at 74.  The condemnor=s experts testified that the property
had a pre-taking value of $67,082 and a post-taking value of $33,541; the
landowner and his two experts testified that the property=s pre-taking value was in the range
of $643,987.20 to $729,256, and its post-taking value was zero.  Id.  As
the court explained, AThere is simply no testimony or other evidence in this
record that the post‑taking value was higher than
$33,541 . . . .@  Id. at 75 (emphasis added).  

The Callejo court rejected the
notion that the jury may calculate post-taking value by Ablending@ testimony concerning pre-taking
value with testimony regarding post-taking value.  Id.  The court
explained that, although jurors are not bound, as a matter of law, to accept
expert testimony, they cannot Aleap entirely outside of the evidence in answering any
question submitted to them.@  Id.  The court also found unpersuasive the argument
that jurors are entitled to rely on their own knowledge and experience as a
substitute for evidence on post-taking value.  Id.; see also State v.
Huffstutler, 871 S.W.2d 955, 959 (Tex. App.CAustin 1994, no writ) (affirming
judgment notwithstanding the verdict because the only evidence of value was the
testimony of one expert that the property=s value was $310,000 and the owner=s testimony that the property=s value was $450,000, but the jury
assigned the property a value of $230,000).








B.        Parallax
Corporation v. City of El Paso

The State responds that jurors are
not bound by the expert testimony, but instead have the discretion to award
damages within the range of the evidence presented at trial.  In support of
this argument, the State cites Parallax Corporation, N.V. v. City of El Paso,
a statutory condemnation case, for the proposition that Athe expert=s testimony as to damages is merely
the beginning point rather than the ending point in examining the sufficiency
of the evidence . . . .@  910 S.W.2d 86, 92 (Tex. App.CEl Paso 1995, writ denied).  In Parallax,
the Eighth Court of Appeals held that Parallax waived its legal-sufficiency
challenge, but stated that, even if the challenge had been preserved, there was
evidence supporting the jury=s finding that the condemned land had a fair market value of
$606,703.76.  Id. at 90B91.  In particular, the City=s expert testified to a value of 20
cents per square foot, arriving at a total figure close to the jury=s findingC$672,000.  Id.  In addition,
the jury considered evidence supporting a lower price per square foot, and
evidence that appraisals are not an exact science.  Id. at 91.  The
court further held that the evidence was factually sufficient because the jury
did not significantly depart from the value range presented by the experts at
trial.  Id. at 92B93.  The court distinguished Callejo and Huffstutler,
stating that both courts relied upon the absence of value evidence other than
expert testimony in the respective records.  Id. at 91B92.  In contrast, the Parallax court
cited detailed information about various comparable sales and testimony that
appraisals are inexact.  Id. at 91B93.  Finally, the court stated that such
evidence created a Arange@ from which the jury could calculate value.  Id. at 92B93. 








Waterways, on the other hand, asserts
that Parallax was wrongly decided and should not be followed by this
court.[15]  According
to Waterways, the jury=s value finding must correspond with expert opinion testimony
regarding the property=s fair market value.  Significantly, however, Waterways bases
this argument on cases in which no other value evidence was identified in the
record.  See, e.g., Callejo, 755 S.W.2d at 75 (AThere is simply no testimony or
other evidence in this record that the post‑taking value was higher
than $33,541 . . . .@) (emphasis added); Huffstutler,
871 S.W.2d at 959 (AEvidence admitted at trial about the value of the property
was based on the testimony of two witnesses . . . .@); Wegner v. State, 829 S.W.2d
922, 923 (Tex. App.CTyler 1992, writ denied) (AThe Wegners= two value witnesses provided the
only evidence on the issue.@).  As long as Aa rational basis for the calculation
of damages exists, a jury=s finding will not be disregarded merely because its
reasoning in arriving at its figure may be unclear.@  Pleasant v. Bradford, 260
S.W.3d 546, 559 (Tex. App.CAustin 2008, pet. denied).  

C.        Value
Evidence

Here, the jury was presented with
documentary evidence as well as expert testimony from which it could evaluate
the property=s fair market value.  The record includes extensive testimonial and
documentary evidence regarding the comparability of five other sales, as well
as conflicting testimony regarding the highest and best use of the property,
the number of usable acres, the cost to level the levee, and fair market value
overall.  Teel testified that the most profitable use of the property would be
to operate it as a dredge material placement site until it reached capacity,
then develop residential property.  Dominy, however, testified that PA 42, like
Laguna Harbor, would be best developed for primary residential use, and that
rather than adding value to the property, the levee and outfall improvements
would have to be removed or redesigned.  The jury was free to find Dominy=s testimony more persuasive, and
thus, accord less weight to Waterways=s evidence of the cost of these
improvements and of possible income from tipping fees or sales of dredge
materials.








In arguing that the jury computed a
value outside the range of evidence, Waterways cites testimony on three points:
Dafonte=s testimony that the property=s value on September 30, 2004 was
$5,000,000; Teel=s testimony that the property was worth $3,900,000; and
Dominy=s testimony that he wrote a report in
which he estimated PA 42=s fair market value at $2,908,368.  This picture, however, is
incomplete.  Not only was each witness subjected to searching cross-examination
to highlight weaknesses in his respective position, but the jury also
considered Teel=s detailed report, maps, photographs, surveys, and
descriptions of comparable sales.  








Waterways theorizes that the jury=s market-value finding is based on
calculations that applied the gross price per acre for a combination of usable
and unusable acreage on comparable sales properties to the number of usable
acres on PA 42.  The State, on the other hand, contends that the jury=s finding is supported by the
evidence of the property=s purchase price at a bankruptcy sale four years earlier[16]
and its assessed tax value.[17]  On this
record, however, the jury=s finding falls within the range of the evidence without
relying on such methods or background information.  And A[w]hen the trial evidence supports a
range of damages awards, >as opposed to two distinct options,= an award within that range is an
appropriate exercise of the jury=s discretion . . . .@  Vela v. Wagner & Brown, Ltd.,
203 S.W.3d 37, 49 (Tex. App.CSan Antonio 2006, no pet.) (quoting Nat=l Plan Adm=rs, Inc. v. Nat=l Health Ins. Co., 150 S.W.3d 718, 740 (Tex. App.CAustin 2004), rev=d on other grounds, 235 S.W.3d 695 (Tex. 2007)).  Here,
as the following example illustrates, the jury=s valuation finding may be based on a
variety of factors and conflicting evidence.

Teel testified that he arrived at his
valuation for the land alone by considering four comparable sales to arrive at
price for each usable acre, multiplying the price per acre by the number of
usable acres, subtracting the cost to level the levee for development, and
rounding up.  Thus, he began with a price of $15,000 per acre; multiplied this
by 224.458 usable acres to obtain a gross sales price of $3,366,870; subtracted
$171,450 as the cost to level the levee; and rounded the result upwards to
arrive at a total of $3,200,000.  But the State offered evidence that there
were only 219.337 usable acres and the cost to level the property could be as
high as $1,000,000.  Using these figures, the jury could have valued each
usable acre of PA 42 as high as $12,765.74 and still concluded that the fair
market value of the property was only $1,800,000.[18] 
This price-per-acre is more than three times higher than the $3,891.00 per acre
paid for Laguna Harbor.  It also exceeds the price paid for each usable acre of
Land Sale Nos. 1 and 2, based on their sales prices as determined in August
2004, only  a month before the taking.  See Exxon Pipeline Co. v. Zwahr,
35 S.W.3d 705, 716 (Tex. App.CHouston [1st Dist.] 2000) (explaining that the jury could
compute fair market value from detailed information regarding comparable
sales), rev=d on other grounds, 88 S.W.3d 623 (Tex. 2002).  It was within the jury=s discretion to accord less weight to
Land Sale No. 3, which occurred eight months before the taking and, unlike PA
42, involved beachfront property on the Gulf of Mexico with direct access to
State Highway 87.  Similarly, the jurors could find Land Sale No. 4, which
occurred nearly a year before the taking, a less Acomparable@ sale than those that took place
closer in time to the State=s taking of PA 42. 








We cannot and need not know how the
jury arrived at its finding, but as the foregoing discussion demonstrates, the
finding is supported by more than a scintilla of evidence; thus, the evidence
is legally sufficient to support the judgment.  Because we cannot say, based on
this record, that the jury=s finding is against the great weight and preponderance of
the evidence, we conclude that the evidence is factually sufficient as well. 

V. 
Conclusion

Because the jury=s finding falls within the range of
the evidence, we conclude that the evidence is legally and factually sufficient
to support the finding.  We therefore overrule Waterways=s first and second issues on appeal
and affirm the trial court=s judgment. 

 

 

 

/s/        Eva M. Guzman

Justice

 

 

Panel
consists of Chief Justice Hedges and Justices Guzman and Brown. 









[1]  According to the State=s petition for condemnation, John Dafonte, one of the owners of PA 42,
was the registered agent for Waterways on the Intercoastal, Ltd., a/k/a
Waterways on the Intracoastal, Ltd. and Port Bolivar Marine Services, Inc. 
Laguna Resources, Ltd. is listed in the petition as a Texas limited partnership
with a different agent for service of process.  Waterways, Port Bolivar Marine
Services, and Laguna Resources were collectively referred to as Adefendant@ in
the petition for condemnation.  The objection to the special commissioners= award was styled ADefendant,
Waterways on the Intercoastal, Ltd. a/k/a Waterways on the Intracoastal, Ltd.,
Objections to Special Commissioners=
Award.@  





[2]  Teel assumed a taking date of August 18, 2004 in
making his valuation. 





[3]  Teel considered the cost to build a six-foot levee
instead of a nineteen-foot levee in his replacement-cost valuation because,
according to Teel=s report, A[t]he
19= high levee is considered to have some functional
obsolescence and the only remaining usable [sic] would be the 6= high levee.@ 
Hollie Stanley, the engineer who provided Teel with estimates for leveling the
levee and rebuilding the levee and outfall structure, testified that he had
seen a document that listed the cost for a complete reconstruction of the levee
at its full height at $2.8 million to $2.9 million. 





[4]  The jury also heard testimony on Teel=s income method of valuation.  Under this approach,
Teel calculated the cubic yards of capacity available for dredge placement and
the market price to deposit dredge material there.  Although he ultimately
valued the property using this method at $4.08 million, he considered the cost
approach the better valuation method. 





[5]  On appeal, Waterways states that the entire site was
usable for development purposes without the costs of mitigating wetlands.  





[6]  The sale did not close for nearly a year.





[7]  At one point during cross-examination he appeared to
suggest that the size of PA 42 was 219 acres.  During his testimony, State=s witness David Dominy stated that approximately 23
acres of PA 42 contain platted roadways. 





[8]  During his testimony, Stanley stated that the cost
of an outfall structure such as the one on PA 42 would be $125,000.  He
testified that a six-foot levee would not require an outfall structure as
valuable as that found on PA 42.  If he were to completely replace the levee on
PA 42, he would estimate $125,000 for the outfall structure.  Stanley testified
that he had seen a document valuing the outfall structure on PA 42 at $200,000.





[9]  In his income approach, Teel calculated the amount
of cubic yards available for dredge placement on PA 42 and multiplied it by the
industry fee, known as the Atipping fee,@ charged to place dredge material on a site. 





[10]  As described in Teel=s report, PA 42 contained Athree
areas where construction materials have been dug plus a man-made lake area . .
. .@  





[11]  According to Teel=s
report, these improvements included a barn of 5,000 square feet, a paved
private road, and a wooden rail fence.  Teel allocated $135,000 of the purchase
price to these improvements.





[12]  The property is also referred to as Laguna Resources
in the record.





[13]  During direct examination, Dominy stated, A[I]tem B is the first transaction that I utilized
which is as you can see just across this little area from the subject property
or disposal area 42 or Placement Area 42.@ 
He later confirmed that AB@ was Laguna
Harbor.  





[14]  In the tax analysis, it is stated that A[t]his is a 374.8-acre tract with a 2004 market
assessed value of $635,840 or $1,696 per acre and an agricultural productivity
value of $14,990 or $40 per acre.@ 
This information includes the parent tract.





[15]  This court has cited Parallax with approval
before, see Bayer Corp. v. DX Terminals, Ltd., 214 S.W.3d 586, 606 (Tex.
App.CHouston [14th Dist.] 2006, pet. denied), as have the
First, Second, Third, Sixth, and Thirteenth Courts of Appeals.  See, e.g.,
Pleasant v. Bradford, 260 S.W.3d 546, 560 (Tex. App.CAustin 2008, pet. denied); Kinder Morgan N. Tex.
Pipeline, L.P. v. Justiss, 202 S.W.3d 427, 443 (Tex. App.CTexarkana 2006, no pet.);  Exxon Pipeline Co. v.
Zwahr, 35 S.W.3d 705, 716 (Tex. App.CHouston
[1st Dist.] 2000), rev=d on other grounds, 88 S.W.3d
623 (Tex. 2002); Aboud v. Schlichtemeier, 6 S.W.3d 742, 748 (Tex. App.CCorpus Christi 1999, pet. denied); Chitwood v.
State, No. 2‑04‑323‑CV, 2006 WL 1452621, at *3 (Tex. App.CFort Worth May 25, 2006, pet. denied) (mem. op.).





[16]  Actual sale price is not prima facie evidence of
market value when the sale is not one between a willing buyer and a willing
seller.  See SPT Fed. Credit Union v. Big H Auto Auction, Inc., 761
S.W.2d 800, 801 (Tex. App.CHouston [1st
Dist.] 1988, no writ) (holding trial court did not err when it concluded
evidence that boat sold at auction for $700 after being reclaimed by credit
union was not sufficient to show boat=s
fair market value).  





[17]  But see City of Sherman v. Wayne, 266 S.W.3d
34, 49 (Tex. App.CDallas 2008, no pet.) (A[T]he tax appraisal is no criterion of market value in condemnation
proceedings because it rarely reflects the true market value.@); Houston Lighting & Power Co. v. Fisher,
559 S.W.2d 682, 686B87 (Tex. Civ. App.CHouston
[14th Dist.] 1977, writ ref=d n.r.e.) (A[I]t is generally held that the value placed upon real
property for the purposes of taxation by assessment without participation of the
landowner is not evidence of its value for purposes other than taxation.@). 





[18]  (219.337 acres x $12,765.74/acre) - $1,000,000.00
leveling cost = $1,799,999.11.